1   room, we'll take a quick recess.

2       (The jury retired to the jury room and a recess

3        was taken.)

4       THE COURT:  Let's bring the jury back.

5       (The jury returned to the courtroom.)

6       THE COURT:  Ms. Painter.

7       CLERK:  Raise your right hand, please.

8       (The witness was sworn.)

9

10      KATHERINE PAINTER, was called as a witness, and

11  after having been first duly sworn, was examined and

12  testified under her oath as follows:

13

14                      DIRECT EXAMINATION

15  BY MS. JOHNSON:

16    Q.  Good afternoon.  Would you please tell the ladies

17  and gentlemen of the jury your name?

18    A.  Katherine Painter.

19    Q.  Ms. Painter, I'm just going to ask that you

20  please speak up and speak into that microphone so we can

21  all hear you.  Okay?

22    A.  Okay.

23    Q.  And, Katherine, for purposes of the court

24  reporter, could you spell your first name?

25    A.  K-a-t-h-e-r-i-n-e.

PLAINTIFF'S
EXHIBIT

1    Q.  And let's just get right to it.  You came out

2  from the back and you're in orange.  Are you currently

3  in jail?

4    A.  I am.

5    Q.  And, in fact, are you a convicted felon?

6    A.  I am.

7    Q.  Were you an inmate at the Lynchburg Adult

8  Detention Center, which is part of the Blue Ridge

9  Regional Jail here in the Lynchburg, back in April of

10  2015?

11    A.  Yes, ma'am.

12    Q.  And when you first got to the Lynchburg Adult

13  Detention Center where were you first being held?

14    A.  In intake.

15    Q.  And is there any particular reason that you were

16  down in intake?

17    A.  I had some incompatibles that I didn't get along

18  with in my classification.

19    Q.  So they just had you down in intake to keep you

20  separate from the others?

21    A.  Yes, ma'am.

22    Q.  Did you have some other issues going on that led

23  you to being separated from the population?

24    A.  No, ma'am.

25    Q.  Now, what cell were you originally in in intake?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 2 of 62   Pageid#: 395

1    A.   When I was on suicide watch I was in cell four.

2    Q.   So is suicide watch also in intake?

3    A.   Yes, ma'am.

4    Q.   So you had the suicide watch and then also the

5    incompatibles?

6    A.   Yes, ma'am.

7    Q.   When were you on suicide watch?

8    A.   April 16th to April 21st.

9    Q.   When you were on suicide watch --  I see that

10   you're in orange right now.  When you were on suicide

11   watch were you also provided with an orange jumpsuit?

12   A.   No, ma'am.  They take your clothes and you can

13   wear the suicide blanket, which is about as tall as me.

14   You can wrap it around you and you wear it like a turtle

15   shell type thing.

16   Q.   And which did you have?

17   A.   The suicide blanket.

18   Q.   And you said that was until the 21st?

19   A.   Yes, ma'am.

20   Q.   And so after the 21st where were you?

21   A.   Then I went to cell three and started my fifteen

22   days in disciplinary.

23   Q.   And then at some point were you moved to cell

24   one?

25   A.   Yes, and then I got moved to cell one.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 3 of 62   Pageid#: 396

1    Q.   And was that also April of 2015?

2    A.   Yes, ma'am.

3    Q.   Katherine, I'm going to try to -- do you

4    recognize that area?

5    A.   Yes, ma'am.

6    Q.   Tell the jury what that is.

7    A.   Where I was being held.

8    Q.   And would you agree with me that the door says

9    holding one?

10   A.   Yes, ma'am.

11   Q.   So is that the cell where you were staying?

12   A.   Yes, ma'am.

13   Q.   I'm going to zoom in just a little bit.

14   Sometimes a little technology is a bad thing.  There we

15   go.  Katherine, what is that thing right there?

16   A.   That's our tray slot.

17   Q.   What is that used for?

18   A.   You take your medicine through it.  You get your

19   food through it, books, mail.

20   Q.   So is it a way for you to get things from the

21   outside?

22   A.   Yes, ma'am.

23   Q.   Katherine, I'm going to show you another picture.

24   What's that a picture of?

25   A.   My cell.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 4 of 62   Pageid#: 397

1    Q.  By my cell -- you've already told us you're

2    incarcerated right now.  Is this the cell you're

3    incarcerated in right now?

4    A.  No, ma'am.  That's my cell in Lynchburg.

5    Q.  So that was holding cell one we saw the door of?

6    A.  Yes, ma'am.

7        MS. JOHNSON:  Your Honor, I move to admit

8    Commonwealth's Exhibits 70 and 71 that Ms. Painter has

9    identified.

10       THE COURT:  No objection?

11       MR. VALOIS:  No.

12       THE COURT:  They'll be admitted.

13   Q.  Katherine, we were looking at the door to the

14   holding cell and there was a narrow window there; is

15   that correct?

16   A.  Yes, ma'am.

17   Q.  Were there any other windows in your cell?

18   A.  No, ma'am.

19   Q.  Did you have any clocks in your cell?

20   A.  No, ma'am.

21   Q.  Did you have a calendar in your cell?

22   A.  No, ma'am.

23   Q.  How did you know what time of day it was when you

24   were in holding cell one?

25   A.  You ask officers when they go by.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 5 of 62   Pageid#: 398

1     Q.   Anything else going on that would help you know

2 what time of day it was or night?

3     A.   Just tray time or medicine time.

4     Q.   Was it always the same officers twenty-four hours

5 a day?

6     A.   No, ma'am.

7     Q.   Were you aware of when the officers would change

8 shifts?

9     A.   Yes, ma'am.

10     Q.   Did that help you tell about what time of day it

11 was?

12     A.   Yeah.

13     Q.   Now, it sounds like you were pretty much relying

14 on what was going on outside of your cell in order to

15 know what was going on.

16     A.   Yes, ma'am.

17     Q.   Now, while you were in intake did you meet a jail

18 officer named Timothy Farrar?

19     A.   Yes, ma'am.

20     Q.   Is Mr. Farrar in the courtroom today?

21     A.   Yes, ma'am.

22     Q.   I'm going ask you some questions about him but

23 before I get to that I'm going to show you another

24 picture here or another two pictures. What is that a

25 picture of?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 6 of 62   Pageid#: 399

1    A. Lynchburg's intake.

2    Q. And for the record, I'm showing her what's

3    already been marked as Commonwealth's Exhibit Number 16.

4    That's Lynchburg's intake?

5    A. Yes, ma'am.

6    Q. Katherine, I'm going to ask you can you draw an

7    arrow? You can just touch like I just did there. Can

8    you use the pad of your finger and draw an arrow to

9    where your cell was?

10   A. In here.

11   Q. Press a little harder. Okay. That door that

12   we're seeing, is that the door to your cell?

13   A. No, ma'am. That's a separate door to the

14   corridor.

15   Q. And looking at this picture, can you draw an

16   arrow or show me where the control desk is?

17   A. Over here.

18   Q. And then I'm going to show you another picture a

19   little bit closer up. And for the record, I'm showing

20   Katherine what's been marked for identification as well

21   as Commonwealth's Exhibit Number 62. Is this another

22   picture of intake?

23   A. Yes, ma'am.

24   Q. I'm going to ask you the same thing. Can you

25   draw a circle around or indicate by an arrow how you get

EVANS & COMPANY
434-239-2552

1  to the cell where you were staying?

2      A.  Right here.

3      Q.  And, again, just draw a circle around where the

4  control desk was.

5      A.  (Within complied.)

6      Q.  Now, I had begun to ask you, while you were in

7  intake did you come to meet an individual by the name of

8  Timothy Farrar?

9      A.  Yes, ma'am.

10     Q.  I believe you've already indicated that he is in

11 the courtroom today?

12     A.  Yes, ma'am.

13     Q.  Now --

14         MR. VALOIS:  Excuse me, Your Honor.  My view of

15 the witness is obstructed by the screen.

16         THE COURT:  If you could take the screen and push

17 it back.

18         MR. VALOIS:  Thank you.

19     Q.  Ms. Painter, he's in the courtroom today.  Can

20 you just give a description for the record where he's

21 seated?

22     A.  Over to the right.

23     Q.  And there are two men that are over to your

24 right; is that correct?

25     A.  Yes, ma'am.

1   Q.   Is he one in the middle or the end?

2   A.   On the end.

3   Q.   Now, on which end as you're facing --

4   A.   This end.

5   Q.   On the right end from you?

6   A.   Yes, ma'am.

7   Q.   And then there's a female beside him?

8   A.   Uh-huh.

9   Q.   I just want to make sure we're all on the same

10  page.  I want the record to reflect that she described

11  Mr. Farrar.

12       THE COURT:  It will.

13  Q.   How did you meet Mr. Farrar?

14  A.   He was the jail worker.

15  Q.   And where was he working in the jail whenever you

16  were there?

17  A.   In intake.

18  Q.   Katherine, you are speaking just a little bit low

19  and so I'm going to ask you to speak up because we want

20  to hear what you have to say.  Do you remember what

21  shift the Defendant was working when you were there?

22  A.   Night shift.

23  Q.   Now, you say he was the jail worker and you were

24  the inmate.  Did there come a time when the relationship

25  became something other than a jail officer and an inmate

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 9 of 62   Pageid#: 402

1   between you and the Defendant?

2       A.   Yes, ma'am.

3       Q.   When did that start happening?

4       A.   Around April 24th.

5       Q.   And so something happened on April 24th?

6       A.   Yes, ma'am.

7       Q.   Was there anything significant that occurred

8   before April 24th?

9       A.   While I was on suicide watch I had to show my

10  body for my toilet tissue.

11      Q.   You had to show your body to who?

12      A.   Tim Farrar.

13      Q.   And you've already mentioned that you were

14  wearing a blanket during that time?

15      A.   Yes, ma'am.

16      Q.   Would he make any other statements or comments or

17  do anything else to you or with you whenever you were on

18  suicide watch?

19      A.   He just asked me to flash my body and I guess try

20  to reward me with snacks.

21      Q.   And so then you said something significant

22  happened on April 24th; is that right?

23      A.   Yes, ma'am.

24      Q.   Were you having any particular issues or problems

25  on April 24th?

1    A.  Yes, ma'am.  I have a GI tract problem.  I take

2  medicine for it.

3    Q.  What medicine do you normally take?

4    A.  Either Mylanta or Phenergan.

5    Q.  And so on April 24th you were having that

6  particular problem?

7    A.  Yes, ma'am.

8    Q.  Did you ask for any help for that problem?

9    A.  Yes, ma'am.

10    Q.  What did you ask for?

11    A.  I asked for my medication.

12    Q.  Who did you ask?

13    A.  Mr. Farrar when he did a round.

14    Q.  So you said he worked night shift.  So it was

15  overnight that you were asking him for this?

16    A.  Yes, ma'am.

17    Q.  And did you tell him what was going on with you,

18  why you needed the medicine?

19    A.  No, it's in our -- it's all in our file.

20    Q.  So he would have been able to access that and see

21  that you need it?

22    A.  Yes, ma'am.

23    Q.  Did the Defendant bring you medicine?

24    A.  Yes, ma'am.  Instead of the nurse, he did.

25    Q.  Had you gotten your medicine before?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 11 of 62   Pageid#: 404

1    A.  Yes, ma'am.

2    Q.  Who normally would bring you your medicine?

3    A.  The medical staff.

4    Q.  But on this occasion the Defendant brought it to

5  you?

6    A.  Yes, ma'am.

7    Q.  Now, you've already described for us and showed

8  us the picture of the door and door slots.  Is that how

9  you received your medicine that time?

10    A.  No, ma'am.  He popped my door and came in and

11  brought it to me.

12    Q.  What does it mean to pop your door?

13    A.  It's all electronic.

14    Q.  I think you kind of showed us that already but

15  just to be clear, is that what we're looking at at the

16  bottom of the screen there?

17    A.  Yes, ma'am.

18    Q.  So he popped the door and came in?

19    A.  Yes, ma'am.

20    Q.  Where were you when he came in?

21    A.  I had two mats in the floor up against the

22  concrete.

23    Q.  So were you on the mats or were you somewhere

24  else?

25    A.  Sitting on the mats.

1    Q.   And what were you wearing?

2    A.   Just my T-shirt and blue shorts.

3    Q.   So you didn't have on an orange jumpsuit like you

4  have on today?

5    A.   No, ma'am.

6    Q.   And what happened when he popped the door and

7  came into your cell?

8    A.   He asked me for oral sex.

9    Q.   Did he have the medicine with him?

10    A.   Yes, ma'am.

11    Q.   What was the medicine -- how was he carrying the

12  medicine?

13    A.   In a cup.

14    Q.   Did he offer you the medicine?

15    A.   Yes, ma'am.

16    Q.   And before or after he asked you for oral sex?

17    A.   Before.  No.  He asked me for it and then told me

18  I could have my medicine.

19    Q.   So he asked you for oral sex and then told you

20  you could have your medicine?

21    A.   Yes, ma'am.

22    Q.   Are those the words that he used?

23    A.   Yes, ma'am.

24    Q.   He said oral sex?

25    A.   Well, he said a blow job.

EVANS & COMPANY
434-239-2552

1    Q.  And what did you take that to mean?

2    A.  Oral sex.

3    Q.  How did you respond?

4    A.  Do I have to?

5    Q.  And what did he say?

6    A.  Do you want your medicine?

7    Q.  So what did you do?

8    A.  I couldn't because I was already sick to my

9  stomach.

10   Q.  So did you do anything?

11   A.  I mean, I tried but I couldn't do it.  I was sick

12  to my stomach.

13   Q.  How far did you get?

14   A.  Just until he put it in my mouth and then I

15  gagged and had to get sick.

16   Q.  Now, Katherine, I know there's a lot of strangers

17  here and we're asking you to describe some intimate

18  details but because these are serious proceedings we do

19  need to have the details.  Okay?  So when you say he put

20  it in, I want to make sure all of us understand what

21  you're talking about.  What did he put in your mouth?

22   A.  His penis.

23   Q.  And you said you tried to give oral sex?

24   A.  Uh-huh.

25   Q.  How long did that go on?

EVANS & COMPANY
434-239-2552

1    A.   Probably for about ten minutes or so.   I really

2    don't know.   We don't have no clocks or nothing.

3    Q.   What happened next?

4    A.   Then I think that was it that time.

5    Q.   Did you get your medicine?

6    A.   Yeah.

7    Q.   Did he say anything else to you?

8    A.   No.   He just kind of walked out of the room and

9    shut the door.

10    Q.   Was anybody else working that night?

11    A.   Corporal Woody.

12    Q.   Anybody else?

13    A.   No, ma'am.

14    Q.   And Corporal Woody, was he there working when

15    these things took place with the Defendant?

16    A.   No, he left and went to another unit to do a

17    round.

18    Q.   So he was not there but you knew him?

19    A.   Right.

20    Q.   So was the Defendant there by himself?

21    A.   Yes, ma'am.

22    Q.   Was there anybody else in intake that night?

23    A.   Just the white shirt did a round before lights

24    out and then, you know, other people that would be

25    brought in.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 15 of 62   Pageid#: 408

1    Q.   Other inmates?

2    A.   Uh-huh.

3    Q.   So you said a white shirt.  Is there something

4    different between a white shirt and --

5    A.   They're like higher up.

6    Q.   So the white shirt did come and do the rounds?

7    A.   Yes, ma'am.

8    Q.   Katherine, did you say anything --  when the

9    white shirt did the rounds did you say anything about

10   what had happened between you and the Defendant?

11   A.   Not that time.

12   Q.   Why not?

13   A.   I'm an inmate.  They're not going to believe me

14   over him.

15   Q.   Now, was this the only time that there was any

16   intimate contact, any sexual contact between you and the

17   Defendant?

18   A.   No, ma'am.

19   Q.   Was there one more time or more than one more

20   time?

21   A.   One more time.

22   Q.   And about when did the second time occur?

23   A.   Around or about May 2nd.

24   Q.   And how are you coming up with that date?

25   A.   Because these are days that I spoke with Chuck

1    Felmlee and went to the dentist.

2        Q.   So what did you have to go to the dentist for?

3        A.   I had my back section removed on my lower right

4    side.

5        Q.   And so after you were seen by the dentist, what

6    condition was your mouth in?

7        A.   I had stitches.  Probably about that much.

8        Q.   Just for the record, you're indicating about an

9    inch or so?

10       A.   Uh-huh.

11       Q.   And then you also mentioned that you had to go

12   talk to Chuck Felmlee?

13       A.   Yes.

14       Q.   And who does Chuck Felmlee work with?

15       A.   The Commonwealth.

16       Q.   Did Chuck Felmlee come to see you at intake?

17       A.   No, ma'am.  I left and went to the West Building

18   and spoke to him.

19       Q.   So you were transported from intake to the West

20   Building?

21       A.   Yes, ma'am.

22       Q.   The second event with the Defendant, did that

23   happen on the same day that you met with Mr. Felmlee?

24       A.   It was a couple of things going on.  It was

25   in-between the time that I talked to Andrew Childress

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 17 of 62   Pageid#: 410

1  and Chuck Felmlee.

2      Q.  And what else do you remember about that

3  particular occasion?  Did anything else significant

4  happen?

5      A.  No, ma'am.

6      Q.  But there was another act?

7      A.  Yes, ma'am.

8      Q.  Were you still being housed in cell one at that

9  time?

10      A.  Yes, ma'am.

11      Q.  Was there anybody in cell two beside you?

12      A.  No, ma'am.

13      Q.  Had there been anybody in cell two?

14      A.  Just like bring them in and sober up.

15      Q.  How did the second event, how did that come

16  about?

17      A.  It was going to be my rec time and I asked for my

18  medicine.  My medicine was PRN and so I got it as I

19  needed it.

20      Q.  And what was that medicine for?

21      A.  The GI tract problem.

22      Q.  What is rec time?

23      A.  That's where I get to come out for my hour and

24  fifteen minutes a day.

25      Q.  Do you know about what time of day or night that

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 18 of 62   Pageid#: 411

1  normally was?

2     A.  It's on evening shift because first shift doesn't

3  give it out.

4     Q.  So you've already told us that Officer Farrar

5  worked the evening shift; is that right?

6     A.  Yes, ma'am.

7     Q.  So it was rec time and you asked for your

8  medicine.  Then what happened?

9     A.  Then he came into my cell and asked me for sex

10  for the medicine.  He kind of stood me up, bent me over

11  and put his penis inside me.  When he was done he

12  ejaculated in a washcloth, put it in his side pocket,

13  went to the bathroom and let me out for my rec time.

14     Q.  You said he came in and asked you for sex.  Is

15  that the only thing he asked you for?

16     A.  Yes, ma'am.

17     Q.  Did he want you to do anything else?

18     A.  Just oral sex but I had stitches in my mouth.  My

19  mouth was bleeding.  The medicine that they brought is

20  actually medicine that I can't take.

21     Q.  That you can't take?

22     A.  Yes, ma'am.

23     Q.  So he asked you for oral sex and how did you

24  respond to that?

25     A.  I can't.  I have stitches in my mouth.

```
 1    Q.  And then what did he say or do?

 2    A.  Then I'm going to do something and he stood me up

 3  and bent me over.

 4    Q.  Did he say anything else?

 5    A.  No, ma'am.

 6    Q.  You said he bent you over.  Did he bend you over

 7  anything in particular?

 8    A.  The wooden bench on the left side of the picture.

 9    Q.  I'm sorry.  I didn't hear the first part.

10    A.  The wooden bench in the left side of the picture.

11    Q.  And at that point he entered you from behind; is

12  that right?

13    A.  Yes, ma'am.

14    Q.  How long did that last?  Do you know?

15    A.  Probably about ten or fifteen minutes.

16    Q.  And then you said he allowed you to go ahead and

17  do your rec time?

18    A.  Yes, ma'am.

19    Q.  What did you do?

20    A.  I went and took a shower and then called home.

21    Q.  How did you call home?

22    A.  On the jail phone.

23    Q.  How many phones does the jail have?

24    A.  Two black ones on either side of the --

25    Q.  Two black phones?
```

Case 6:17-cv-00034-NKM-RSB  Document 58-1  Filed 05/09/18  Page 20 of 62  Pageid#: 413

1    A.   Yes, ma'am.

2    Q.   Now, do you have to do anything in particular in

3    order to use those phones?

4    A.   Just dial nine.

5    Q.   And are inmates regularly allowed to use those

6    phones?

7    A.   No, ma'am.

8    Q.   What phones do inmates usually use?

9    A.   A secured phone.

10   Q.   What's the difference between the black phone and

11   the secured phone?

12   A.   The secured phone you have to have your own phone

13   time on there.  You have to have money on there in order

14   to call out.

15   Q.   Do you need money on the black phones in order to

16   use those?

17   A.   No, ma'am.

18   Q.   So at this point --  This is May and so at this

19   point you had actually been in the jail for a few weeks,

20   right?

21   A.   Over a month.

22   Q.   So having been there for over a month, was it

23   unusual for you to be able to use the black phone?

24   A.   Yes, ma'am.

25   Q.   I'm moving around here because I'm trying to find

1    a good picture.  How long did you stay on the black

2    phone?

3       A.  Probably about ten or fifteen minutes, maybe

4    longer.

5       Q.  Anybody come back there and make you get off the

6    phone?

7       A.  Just when he did a round, you know, he told me

8    not to take that long.

9       Q.  Who did you call?

10      A.  My significant other.

11      Q.  What did you do after that?

12      A.  I called my mom.

13      Q.  And what did you do after that?

14      A.  Then I went back in my cell.

15      Q.  Katherine, did you do anything else significant

16   that night or anything else different during your rec

17   time?

18      A.  I talked to another inmate.

19      Q.  Katherine, who's responsible for cleaning your

20   cell?

21      A.  Me.

22      Q.  And how does that happen that you're able to

23   clean the cell?

24      A.  You have to get the cleaning supplies during your

25   hour and fifteen minutes.

1    Q.   Katherine, I'm going to show you a video that's

2    already been entered into evidence.   It's Commonwealth

3    Exhibit 65.   And let me get all the bells and whistles

4    hooked up here.   And, again, we're looking at intake in

5    this video; is that correct?

6    A.   Yes, ma'am.

7    Q.   In the interest of time I'm just going to fast

8    forward through this for a minute.   Who is that?

9    A.   Me.

10   Q.   Where were you coming from?

11   A.   The telephone.

12   Q.   So looking at that screen, can you maybe draw an

13   arrow or circle around where the telephones are?

14   A.   The first one is here.   The second one is behind

15   it.

16   Q.   And so which one were you using?

17   A.   The back one.

18   Q.   So that's where you were coming from?

19   A.   Yes, ma'am.

20   Q.   I'm going to ask you about something else on

21   here.   Who is that?

22   A.   Corporal Woody.

23   Q.   What is he doing?

24   A.   Bringing me the cleaning supplies to clean my

25   room.

1     Q.  And did you do anything with those cleaning

2  supplies?

3     A.  I cleaned my room.

4     Q.  Was this on the same evening that you just told

5  us about, Katherine?

6     A.  Yes, ma'am.

7     Q.  And then what did you do after you cleaned your

8  room?

9     A.  I brought it out and took it the corner to put it

10  up.

11     Q.  So you used the telephone, the black telephone.

12  Do you know how long you were on the telephone?

13     A.  About fifteen or twenty minutes.

14     Q.  And then you got the mop and bucket and cleaned

15  your room?

16     A.  Yes, ma'am.

17     Q.  And so all this time you're back there cleaning

18  that we're looking at the video?

19     A.  Yes, ma'am.

20     Q.  And there you go returning your things?

21     A.  Yes, ma'am.

22     Q.  What are you doing there?

23     A.  I got fussed at for putting the mop and broom

24  back myself.

25     Q.  So what did you do after that?

1    A.   I still had the toilet brush in my hand and I

2   finished cleaning my cell.

3    Q.   And after you cleaned your cell what did you do?

4    A.   I went and laid down and cried until I went to

5   sleep.

6    Q.   You were covering your mouth just now.  What did

7   you say?

8    A.   I went to my room and cried myself to sleep.

9    Q.   Why did you do that, Katherine?

10    A.   Because I felt lesser of a person.

11    Q.   Katherine, I'm seeing you in that video.  I'm

12   watching you and the jury is watching you and you are

13   talking to somebody.  Who were you talking to?

14    A.   Corporal Woody is sitting back here.

15    Q.   Who was sitting back there?

16    A.   Corporal Woody did because the white shirts were

17   down there.

18    Q.   So I'm going to ask you the same question again,

19   Katherine.  Why didn't you say something to somebody?

20   The white shirts were down there and Corporal Woody was

21   down there.

22    A.   I'm the inmate and they're the guard.

23    Q.   What does that mean?

24    A.   I mean, I'm a convict.  They're not going to

25   listen to me.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 25 of 62   Pageid#: 418

1    Q.  So you didn't think you would be believed if you

2    spoke up?

3    A.  Right.  When I did ask Mr. Smith if you have a

4    problem with a guard what should you do, he said that he

5    didn't want to be involved because he didn't want to

6    have to come to court.

7         MR. VALOID:  Objection, hearsay.

8         THE COURT:  I sustain the objection.

9    Q.  Katherine, who is Officer Pitts?

10   A.  He actually works on their shift, too, but I

11   didn't meet him until weeks later.  He was on vacation

12   when I first got arrested.

13   Q.  Now, you said that evening you didn't say

14   anything to anybody and you actually had asked about

15   whether or not how you were turned in.  Did there come a

16   time when you did say something to somebody?

17   A.  Yes, ma'am.  I started confiding in another

18   roommate.  I mean another inmate in cell three.  We

19   talked about it.  I actually wrote home to a friend.

20   She -- Well, she's not alive anymore and then my mom

21   and my significant other came and visited me for

22   Mother's Day weekend and I told them.

23        I'd already spoken with the one inmate about it

24   when I told my mom and them and then I made the PREA

25   report.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 26 of 62   Pageid#: 419

1    Q.   I'm going to show you what's been marked for

2    identification as Commonwealth's Exhibit Number 69.   Do

3    you recognize that?

4    A.   Yes, ma'am.

5    Q.   What is that?

6    A.   That is a request form that I put in to speak to

7    Lieutenant Rivers.

8    Q.   When did you put that in?

9    A.   On the 7th of May.

10   Q.   And what does it say?

11   A.   I would like to speak with you in person about

12   something personal.  Mr. Chuck Felmlee, the Commonwealth

13   Attorney, said that if I had any problems to talk to

14   you.  Thanks.

15   Q.   What did you want to speak to Lieutenant Rivers

16   about?

17   A.   What was going on.  PREA, I guess, runs it or

18   whatever.

19   Q.   So it was your understanding that was the person

20   that you needed to try to talk to?

21   A.   Yes, ma'am.

22   Q.   Is this form what you would have had to fill out

23   in order to --

24   A.   You have to fill out one of those for anything.

25   Q.   Who does this form go to?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 27 of 62   Pageid#: 420

1    A.  To the guards that are working.  I also put one

2  in to speak to classifications about something that was

3  bothering me and him and Corporal Woody or Mr. Farrar

4  and Corporal Woody acted like they didn't want to pick

5  it up.

6          MR. VALOIS:  Objection, Your Honor, hearsay.

7          MS. JOHNSON:  She's saying how they acted.

8          MR. VALOIS:  Then I would object to foundation.

9          THE COURT:  Do you want to lay a foundation?

10    Q.  You can't tell us what they said but did you turn

11  in the form?

12    A.  Eventually, yeah.

13    Q.  Did you get a response to this form?

14    A.  Lieutenant Rivers came that Monday and took me

15  into another room and we talked about it and then I got

16  moved to Amherst.

17          MS. JOHNSON:  Your Honor, I move to admit

18  Commonwealth's Number 69.

19          THE COURT:  No objection?

20          MR. VALOIS:  No objection.

21          THE COURT:  That will be admitted.

22    Q.  You also mentioned something about a PREA

23  hotline.

24    A.  Yes, ma'am.

25    Q.  What is that?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 28 of 62   Pageid#: 421

1    A.  It's a number that you dial and you leave like a

2  voice mail.

3    Q.  And you did that as well?

4    A.  Yes, ma'am.

5    Q.  Before or after you filled out that form?

6    A.  After.

7    Q.  Well, if you had already filled out the form to

8  talk to Lieutenant Rivers, why did you also call the

9  PREA hotline?

10    A.  Because I hadn't heard anything back yet.

11    Q.  So you didn't just let it lie.  You took other

12  steps to make sure it got reported?

13    A.  Yes, ma'am.

14    Q.  Katherine, if you hadn't said anything on

15  April 24th and you hadn't said anything on the second

16  occasion, why did you decide to say something on

17  May 7th?

18    A.  Because I didn't want to take it anymore.  I

19  wanted it all to stop.

20    Q.  Now, did you -- I'm not sure how I want to phrase

21  this.  Did you get some benefits from having sex with

22  the Defendant?

23    A.  Just that I got to call home without using my

24  phone time but my family pretty much knew what was going

25  on.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 29 of 62   Pageid#: 422

1    Q.  How long after putting in that form did you call

2    the PREA hotline?

3    A.  The very next day on Mother's Day.

4    Q.  And was the Defendant working on the day that you

5    called the PREA hotline?

6    A.  No, ma'am.

7    Q.  So it was different shift officers?

8    A.  Uh-huh.

9        MS. JOHNSON:  Katherine, I believe those are all

10   the questions that I have for you.  Mr. Valois probably

11   has some and I may come back and talk to you again.

12

13              CROSS EXAMINATION

14   BY MR. VALOIS:

15   Q.  Ms. Painter, how old are you?

16   A.  I'm twenty-nine.

17   Q.  And you went into Lynchburg Adult Detention

18   Center on April 1st of 2015.  Is that the first time you

19   went in?

20   A.  No.

21   Q.  I mean --

22   A.  On this time, yes, sir.

23   Q.  Had you done any extensive jail time before this?

24   A.  No, forty-five days.

25   Q.  And when you came in you went to intake and they

1    put you on suicide watch the first time you came in,

2    too, right?

3        A.    Yeah.

4        Q.    Now, that's a miserable place to be, isn't it,

5    Ms. Painter?

6        A.    Yes, sir.

7        Q.    Is it fair to say it's like being in a dog

8    kennel?

9        A.    I mean, that's what the cell is like, yeah.

10       Q.    And do you get to watch any TV?

11       A.    No, sir.

12       Q.    Did you get to have a radio?

13       A.    No, sir.

14       Q.    How long are you locked up in your room?

15       A.    The whole day except for the hour --  Well, if

16   you're on suicide watch you don't get no time out.

17       Q.    So you're in there all the time.  What is the

18   temperature like?  Is it comfortable in there?

19       A.    No, it's cold.

20       Q.    Real cold, right?

21       A.    (Witness nods head.)

22       Q.    So cold, in fact, you chatted with your teeth so

23   hard you cracked your teeth, right?

24       A.    Uh-huh.

25       Q.    The tooth eventually got pulled by a dentist?

1    A.  Yes, sir.

2    Q.  Now, when you came in were you suffering from any

3  type of substance abuse withdrawal?

4    A.  No, sir.  I just had the GI problems that I

5  always have.

6    Q.  In a phone call to your mother on April 10th

7  didn't you tell her that you were suffering from Cyboxin

8  withdrawal?

9    A.  I don't think so.

10    Q.  Is it possible you did and you don't remember

11  saying that?

12    A.  It could be.

13    Q.  Were you on Cyboxin before you came into the

14  jail?

15    A.  For about three months before I got arrested,

16  yeah.

17    Q.  And is that an opiate?

18    A.  It's kind of for all kind of different things.

19    Q.  Do you suffer from schizophrenia, Ms. Painter?

20    A.  No, sir.

21    Q.  Do you suffer from a mental illness?

22    A.  I mean, I have anxiety problems.

23    Q.  And on April 10th did you make a phone call to

24  your mother asking her to call Johnson Health Center to

25  get your mental health meds going?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 32 of 62   Pageid#: 425

1    A.  Yeah, probably.

2    Q.  And in that phone conversation didn't you tell

3  your mother that you would rather be in population

4  getting beaten than be stuck in intake for twenty-three

5  hours a day?

6    A.  Yeah.

7    Q.  And that it was driving you fucking nuts to be in

8  intake?  Did you say that to her?

9    A.  Probably.

10    Q.  Did you say that you wanted to hang yourself but

11  you were afraid of saying that because you would go back

12  on suicide watch?

13    A.  No, I never said I was going to hang myself in

14  jail.

15    Q.  Did you tell your mother that you wanted to hang

16  yourself but you were afraid of saying so in the jail

17  because they would put you on suicide watch?

18    A.  Not that I recall.

19    Q.  Did you recall telling -- do you know someone

20  named Ben?

21    A.  Yes, sir, that's my significant other.

22    Q.  And do you recall having a conversation with Ben

23  saying that you wanted to sue the Blue Ridge Regional

24  Jail?

25    A.  Yeah.  After I found out he wasn't a real police

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 33 of 62   Pageid#: 426

1    officer and I never had to listen to him to begin with,

2    yes, sir.

3        Q.  Do you recall telling him that you wanted to sue

4    the Blue Ridge Regional Jail because you were being

5    discriminated against because you were white?

6        A.  No.

7        Q.  Is it possible that you said that and don't

8    remember it or are you saying you've never said that?

9        A.  I mean, I may not remember.  It's been a long

10   time.

11       Q.  And is it possible and then did you say that you

12   wanted to sue them because you were being discriminated

13   against because you were a drug addict?  Do you recall

14   making that statement?

15       A.  Not that I recall.

16       Q.  Is it possible you made it and just can't

17   remember?

18       A.  I don't remember.

19       Q.  Now, you've given several different interviews in

20   the course of this case, haven't you?

21       A.  Yes, sir.

22       Q.  Now, the first communication you had with anybody

23   regarding this incident was Meredith Lee; is that

24   correct?

25       A.  Yes, sir.

1    Q.  You wrote her a letter?

2    A.  Uh-huh.

3    Q.  And in that letter you actually refer to three

4  incidents; is that true?

5    A.  Yes, sir.

6    Q.  The 24th of April, the 29th of April and May 1st;

7  is that right?

8    A.  On or about those days.

9    Q.  When did you write that letter to Meredith Lee?

10    A.  I don't remember the date.

11    Q.  And who was Meredith Lee?

12    A.  The inmate that I confided in.

13    Q.  I'm sorry.

14    A.  The inmate that I confided in.

15    Q.  Where was her cell relative to your cell?

16    A.  My cell was one and hers was three.

17    Q.  So she would have been just outside that little

18  vestibule area; is that right?

19    A.  Yes, sir.

20    Q.  And how long did it go from the time -- you just

21  testified on direct there were only two sexual contacts.

22  When Ms. Johnson asked you, you just testified there

23  were only two, right?

24    A.  Yes, sir.

25    Q.  So which is correct?  Were there two or three?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 35 of 62   Pageid#: 428

1    A.  The first time I didn't do it.

2    Q.  So there were not three -- there were not three

3  instances of sex; is that correct?

4    A.  He tried for it to be three but I refused the

5  third one.

6    Q.  When was the third one?

7    A.  I don't remember.  I mean, I don't remember

8  dates.  We don't have calendars.

9    Q.  But it would have been before you filed your

10  inmate request form on the 7th?

11   A.  Yes, sir.

12   Q.  How many days before that?

13   A.  I don't recall.  It's been a long time.

14   Q.  Well, can you estimate?

15   A.  It was only a couple of weeks in-between all the

16  incidents.

17   Q.  But can you estimate --  You're sure you filed

18  that inmate request form on May 7th?

19   A.  Uh-huh.

20   Q.  And you said that some period of time had elapsed

21  between the last sex and that report.  You testified to

22  that on direct examination.  How long was that?

23   A.  I don't know.  About a week or two.

24   Q.  A week or two.  And then at some point after that

25  now you're saying that he attempted to have sex again?

1    A.   No.   I was moved out of the Lynchburg jail on

2    May 11th.

3    Q.   Right, but you just testified that you had two

4    instances of sex and then there was a third time when he

5    attempted to have sexual contact with you but you

6    refused; is that correct?

7    A.   Yeah, that would be when he tried the oral sex.

8    Q.   When was the third time?

9    A.   I don't recall.   I don't recall all the dates.   I

10   mean, I don't have a calendar.   I don't have nothing, a

11   clock, nothing in our cells.

12   Q.   So it would have been before you filed your PREA

13   report?

14   A.   Yeah.

15   Q.   How many days before that was the third incident?

16   A.   I don't remember.

17   Q.   You haven't described that incident yet because

18   Ms. Johnson didn't ask you about the third incident,

19   correct?

20   A.   Right.

21   Q.   What happened in the third incident?

22   A.   He asked me for oral sex and I didn't give it to

23   him because I'd already spoken with my significant other

24   and my family friend who's no longer with us and that's

25   when I knew I didn't have to listen anymore.

1    Q.   Where was he when he asked you for sex the third

2  time?

3    A.   In front of my cell.

4    Q.   Was the door open?

5    A.   No, through the slot before my door was popped

6  for my rec time.

7    Q.   And what type of sex did he ask you for?

8    A.   For oral sex.

9    Q.   What time of day was this?  Do you know?

10   A.   No, sir.

11   Q.   And what exactly did he say to you this third

12  time?

13   A.   I don't remember.

14   Q.   How long was it between the second sex incident

15  and the third time when he attempted to have sex?

16   A.   It was just a couple of days in-between.

17   Q.   A couple of days.  Now, after you filed your PREA

18  complaint you met with Investigator Tomlin.  You met

19  first with Lieutenant Rivers.  Do you remember speaking

20  with Lieutenant Rivers?

21   A.   Yes, sir.

22   Q.   And Lieutenant Rivers is the Internal Affairs

23  Investigator for Blue Ridge Regional Jail; is that

24  correct?

25   A.   Yes, sir.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 38 of 62   Pageid#: 431

1    Q.  Now, when you gave the interview with Lieutenant

2    Rivers you only gave him two dates, the 24th and

3    May 1st.  You didn't mention any other incident; is that

4    correct?

5    A.  I refused and I didn't have to do it and so that

6    was it.

7    Q.  Didn't he ask you if there had been any other

8    suggestions or communication?

9    A.  No, I just told him about it and they, I guess,

10   talked to him and he said whatever he said and then I

11   was moved to another facility.

12   Q.  I understand that but what I'm saying is you

13   reported to Lieutenant Rivers that there were only two

14   incidents and they occurred on the 24th and on May 1st;

15   is that correct?

16   A.  I don't recall.

17   Q.  Well, Lieutenant Rivers specifically asked you

18   about the 29th, didn't he?

19   A.  Yes, sir.

20   Q.  And you agreed that nothing happened on the 29th,

21   didn't you?

22   A.  No.  I think that's when I went to the dentist.

23   That's when I had all the stitches in my mouth.

24   Q.  Isn't it true, Ms. Painter, that you actually

25   went to the dentist on May 1st?

Case 6:17-cv-00034-NKM-RSB  Document 58-1  Filed 05/09/18  Page 39 of 62  Pageid#: 432

1    A.  I'm not really sure which days because we don't

2    have calendars or clocks or anything.

3    Q.  But you went from three incidents with Meredith

4    to two incidents with Lieutenant Rivers, correct?

5    A.  I don't really remember what all I talked to

6    Meredith about.  I didn't have to follow through with it

7    anymore because I'd already talked to my significant

8    other and he knew it was going on and I discovered the

9    fact that he's not a real policer and I didn't have to

10   listen to him.

11   Q.  Who's not a real police officer?

12   A.  Mr. Farrar.

13   Q.  Well, to be clear, you wrote in your letter to

14   Meredith Lee about three incidents.  You've already

15   answered that question, right?

16   A.  I don't really know what me and Meredith talked

17   about.  We talked about several things.

18   Q.  Now, when Lieutenant Rivers started to press you

19   about your story and the inconsistencies you brought up

20   the door log.  You told him to check the door logs,

21   right?

22   A.  Yes, sir.

23   Q.  How did you know about door logs as an inmate?

24   A.  Everything is electronic.

25   Q.  How would you know that?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 40 of 62   Pageid#: 433

1    A.   How else would they open the doors?

2    Q.   But how would you know that there's a log of

3    every door that opens up?

4    A.   I don't understand.  What do you mean?

5    Q.   How would you know that it's possible --

6    A.   Everything is computerized.

7    Q.   But how would you know that it makes a record

8    every time the door opens?

9    A.   Because when you go out for your hour and fifteen

10   minutes they'll tell you I'm about to pop your door.

11   Catch it.

12   Q.   I understand they have the ability to remotely

13   open and close the door.  I understand that but how

14   would you know that every time you do that that it

15   creates a record that can be checked?

16   A.   Everything is computerized.

17   Q.   Now, you had the interview with Lieutenant Rivers

18   and then he left and came back; is that correct?

19   A.   (Witness nods head.)

20   Q.   And your request forms were issued on May 7th; is

21   that correct?

22   A.   (Witness nods head.)

23   Q.   You reported to him that you called your mom four

24   or five times from the black phone in disciplinary?

25   A.   Uh-huh.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 41 of 62   Pageid#: 434

1    Q.   What is disciplinary?

2    A.   You only leave your cell twice a week on Mondays

3    and Thursdays for fifteen minutes to take a shower.

4    Q.   Well, what is disciplinary?   Why were you on

5    disciplinary?

6    A.   For refusing a direct order.

7    Q.   And what is using the black phone mean?

8    A.   Using the jail phone.

9    Q.   And who let you use the black phone?

10   A.   Farrar and Woody.

11   Q.   Now, you told Lieutenant Rivers that this

12   occurred while Woody was out on a round with somebody

13   named Smith and Clark.   Who are Smith and Clark?

14   A.   Smith is a white shirt.   Clark is another

15   corporal, I guess.

16   Q.   What is a round?

17   A.   They do rounds every night before lights out, you

18   know, to check the cells and make sure you haven't, you

19   know, tore anything up, check on everybody's well being.

20   Q.   How long is a round?

21   A.   I don't know.

22   Q.   How long does it take to do a round?

23   A.   They have to do the whole jail and so I don't

24   know.

25   Q.   But did you see them when they go off and do a

1   round and when they come back?

2   A.  No, I can't see anything from my cell.

3   Q.  How did you know that Woody was on a round?

4   A.  Because he wasn't in intake when I came out to

5   take my shower.

6   Q.  But didn't you report to Lieutenant Rivers that

7   you could hear him talking, though?

8   A.  Before they left, yeah.  You can hear their

9   radios.

10  Q.  So how long was it -- how long before the

11  incident occurred was it that you heard Woody talking?

12  A.  I mean, they were sitting out there talking and

13  then something happened and they all left.

14  Q.  Then how long after that was it before the oral

15  sex occurred?

16  A.  I don't know how long.  I don't have a clock or

17  anything.

18  Q.  Can you estimate?  There's a difference between

19  five minutes and half an hour.  Could you estimate no

20  longer than X or no earlier than Y?

21  A.  Probably about fifteen or twenty minutes.

22  Q.  So fifteen to twenty minutes after you heard

23  Woody's voice on the radio?

24  A.  Uh-huh.

25  Q.  Is that yes?

1    A.   Yes.

2    Q.   Now, you've actually been disciplined for

3    lockdown, haven't you, at the jail?  At the Blue Ridge

4    Regional Jail haven't you been disciplined for tampering

5    with the door?

6    A.   I don't remember.  I don't recall.

7    Q.   Do you recall telling Lieutenant Rivers that Liz

8    Davis had told you how to slide a card in-between

9    rolling pieces of the lock with your ID card?

10    A.   No.  Liz Davis popped her door and came at me.

11    Q.   But do you remember telling Lieutenant Rivers in

12    a recorded interview that she taught you how to slide a

13    card in-between --

14    A.   We're incompatibles.  She didn't teach me.  I

15    seen her pop her door and that's when she came at me.

16    We had an altercation and I made a comment and that's

17    why I went on suicide watch a second time.

18    Q.   But that's how you learned to pop the door?

19    A.   I didn't learn.  I don't pop doors.

20    Q.   All right.  Now, after your final interview with

21    Lieutenant Rivers you had an interview with Detective

22    Tomlin.  Do you remember talking with Detective Tomlin?

23    A.   At Amherst County Jail, yes, sir.

24    Q.   He came and talked with you and you told him that

25    there were two instances of oral sex and one instance of

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 44 of 62   Pageid#: 437

1    vaginal sex.  Is that true?

2        A.  I don't recall what I talked to him about.  I

3    don't.

4        Q.  Do you remember telling him that you had oral sex

5    on the 24th and the 29th and vaginal sex on May 1st?

6        A.  I mean, that would probably be around the right

7    dates when I had the stitches in my mouth and all that.

8        Q.  But that would be three instances of actual sex

9    then, right?

10       A.  No.

11       Q.  Well, two instances of oral sex plus another

12   instance of vaginal sex on May 1st?

13       A.  I don't consider oral sex sex.

14       Q.  But there were three separate incidents involving

15   sexual conduct?

16       A.  I refused one.

17       Q.  But you didn't tell --  when you had your

18   interview with Detective Tomlin you told him that you

19   had --  Well, let's do it incident by incident.  You

20   told Lieutenant Tomlin that you had oral sex on the 24th

21   of April.  Do you recall making that statement?

22       A.  Yes, sir.

23       Q.  And you told him you had oral sex again on the

24   29th of April.  Do you recall making that statement?

25       A.  Yes, sir.

1    Q.  Do you recall making the statement that you had

2  vaginal sex on May 1st?

3    A.  I would had to have because that's when my mouth

4  was still bleeding.

5    Q.  So if vaginal sex occurred, it would have to have

6  occurred on May 1st?

7    A.  Around thereabout.

8    Q.  But then how many days?

9    A.  Within a week because I made the report on

10  May 8th, which was Mother's Day.

11    Q.  Within a week of May 1st?  Do you recall telling

12  Investigator Tomlin that you got a urinary tract

13  infection as a result of the vaginal sex?

14    A.  Yes, sir, I did.

15    Q.  Do you remember telling Investigator Tomlin that

16  you reported your urinary tract infection on the

17  following Saturday?

18    A.  Yes, sir, that's when I --

19    Q.  That would be May 2nd.  Do you recall telling

20  Investigator Tomlin that on May 4th you actually gave a

21  urine sample to Nurse Polk and got treatment and then

22  antibiotics for the urinary tract infection?

23    A.  I wasn't on antibiotics for the UTI.  I was on

24  antibiotics for my teeth.

25    Q.  Maybe I misspoke, but do you recall telling

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 46 of 62   Pageid#: 439

1  Detective Tomlin that you received medicine on May 4th,

2  Monday, May 4th, for the urinary tract infection that

3  you got as a result of the sex?

4      A.  The medicine that I received from Ms. Polk was

5  Ibuprofen and I'm actually allergic to that medicine but

6  it was more for my dental problems.  It had nothing to

7  do with my UTI.

8      Q.  Do you recall telling Detective Tomlin that you

9  received treatment from Nurse Polk on May 4th for the

10  urinary tract infection that you received as a result of

11  the sex that you claim had occurred with Mr. Farrar?

12      A.  Not that I recall.

13      Q.  Now, you testified that the first incident of

14  oral sex that you put it in your mouth but you couldn't

15  do it.  That's what you told Ms. Johnson; is that

16  correct?

17      A.  Yes, sir.

18      Q.  So nothing happened there?  He didn't ejaculate?

19      A.  No, sir, not that I recall.

20      Q.  And you said on the 29th -- do you recall telling

21  Detective Tomlin that on the 29th you got peanut butter

22  Pop Tarts and coffee?

23      A.  Yeah, I did.

24      Q.  And is that the day you performed oral sex?

25      A.  No.  That's when I was on suicide watch?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 47 of 62   Pageid#: 440

1     Q.   You tell me, Ms. Painter.   Do you remember?

2     A.   No.

3     Q.   Did you report that on the 29th he ejaculated in

4 your mouth?

5     A.   I don't remember.

6     Q.   You said -- do you recall telling Investigator

7 Tomlin that he was in the cell with you for ten or

8 fifteen minutes?

9     A.   Yeah, it was about that long.

10     Q.   On the 29th?

11     A.   Around or about that date.

12     Q.   And you can't remember because you didn't have a

13 calendar?

14     A.   Right. We don't have calendars. You never know

15 what time it is. We don't see outside, nothing.

16     Q.   Do you recall making a statement to Investigator

17 Tomlin telling him that you told Farrar you couldn't

18 give him oral sex because you had just went to the

19 dentist?

20     A.   Yeah.

21     Q.   And do you recall making the statement to him

22 that that turned into vaginal sex?

23     A.   Yes, sir.

24     Q.   And that during the vaginal sex the phone rang?

25     A.   Yeah.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 48 of 62   Pageid#: 441

1    Q.   And Farrar had to quit the sex and go pick up the

2    phone?

3    A.   And run and answer the phone, yes, sir.

4    Q.   And that's when the sex stopped is when he had to

5    go pick up the phone?

6    A.   Yes, sir.

7    Q.   Do you recall making another statement to

8    Investigator Tomlin saying that Farrar actually pulled

9    out and ejaculated into a washcloth?

10   A.   Yeah.  He hurried up and finished and went and

11   answered the phone.

12   Q.   So the phone was ringing and so he hurried up and

13   finished and ejaculated into a washcloth?

14   A.   Yeah, the phone rang for a long time.

15   Q.   And do you recall making a statement to

16   Investigator Tomlin that Farrar attempted to throw the

17   washcloth on the floor?

18   A.   No, he never threw the washcloth away in my room.

19   Q.   Do you recall making a statement to him saying

20   that he was going to throw the washcloth on the floor

21   but you said, oh, no, man.  That's too sick.  Don't do

22   that and then asked him to take it with him?

23   A.   I don't recall.

24   Q.   You don't recall?

25   A.   No.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 49 of 62   Pageid#: 442

1   Q.   Now, did you later find out that Mr. Farrar

2   wasn't working on the 29th and the 1st?

3   A.   Not that I recall.

4   Q.   You don't recall a second interview with

5   Detective Tomlin when he told you just that?

6   A.   When I talked to Detective Tomlin it was -- I'd

7   already -- it was a lot going on in Amherst Jail, too.

8   Q.   I'm asking you right now do you recall having the

9   second interview with Detective Tomlin?

10   A.   Yeah, after he went and talked to Farrar.

11   Q.   And he came back to you and he had Lieutenant

12   Rivers with him then, didn't he?

13   A.   Maybe.

14   Q.   Do you remember them talking with you about door

15   logs and things?

16   A.   I think that's when we were in the classroom in

17   Amherst County and Captain Schmidt might have been in

18   there with us, too.

19   Q.   All right.  Well, I mean, do you recall

20   Investigator Tomlin telling you that it couldn't have

21   been on the 1st or the 29th because Mr. Farrar wasn't

22   working then?

23   A.   Yeah, and that's when I said it was around about

24   them dates because I didn't even know what day it was

25   ever.

1      Q.  And do you recall them showing you different

2   calendars and things trying to help you pick a different

3   date?

4      A.  Yeah, we looked over a calendar a lot.

5      Q.  And do you recall telling them in this meeting

6   that you were actually on disciplinary in Amherst for

7   door tampering?

8      A.  Like now with me being in Amherst?

9      Q.  In the second interview that you had with

10   Investigator Tomlin do you recall telling him about

11   seven minutes into the interview that you were on

12   disciplinary at Amherst for door tampering?

13      A.  I was just standing there but inmate Litchford

14   was the one that actually unlocked the door.

15      Q.  But you were on disciplinary for it?

16      A.  We were both on disciplinary for it.

17      Q.  Now, in that discussion, in that interview with

18   Investigator Tomlin did you bring up that it happened

19   the same night that you went to see Chuck?

20      A.  Yeah.  Those were only the three --  like that's

21   how I tried to figure out what days it was.

22      Q.  So you mean Chuck Felmlee?

23      A.  Yes, sir.

24      Q.  And you were meeting with him as an informant; is

25   that correct?

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 51 of 62   Pageid#: 444

1     A.   I think that's -- I'd rather not comment on

2   that.

3     Q.   But you had met with him on the 6th; is that

4   correct?

5     A.   I don't recall.  I don't want to talk about why I

6   met with Mr. Felmlee.

7     Q.   But in the end you picked the 6th -- you picked a

8   time in the evening of May 6th as when this incident

9   supposedly occurred; is that correct?

10     A.   He filled in one evening on -- it wasn't his

11   shift.  Somebody was sick.  Mr. Alley couldn't come in

12   or Mr. Alley was at the hospital with somebody or

13   something.

14     Q.   Ma'am, that's actually the answer to a different

15   question.  The question I'm asking you is at the end of

16   this or during this interview with Detective Tomlin you

17   settled on the evening of May 6th, 2015 as being the

18   incident when you claimed vaginal sex occurred; is that

19   correct?

20     A.   I don't recall.

21     Q.   Are you claustrophobic?

22     A.   I am.

23     Q.   Were you in communication with any other inmates

24   besides Meredith Lee regarding what you claim happened?

25     A.   I talked to Shawna Johnson when she was in cell

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 52 of 62   Pageid#: 445

1    two.

2       Q.   Have you been passing notes with any other

3    inmates in intake?

4       A.   Yeah.

5       Q.   Do any of those notes discuss you offering sex in

6    exchange for corroboration of your story?

7       A.   No.

8       Q.   Did you ever offer to have sex with an inmate

9    named Butler?

10      A.   No, sir.  Me and Butler are friends from school.

11      Q.   Now, do you recall telling Investigator Tomlin

12   that after the second sex you went out and got a mop and

13   mopped your own room?

14      A.   Yeah, I clean my room every day.

15      Q.   Do you remember telling him that you went and got

16   a mop from a room?

17      A.   It's just around the corner.  Yeah, I went and

18   got the mop during my rec time.

19      Q.   And this would have been the evening when you say

20   vaginal sex occurred?

21      A.   Probably.

22      Q.   Well, did ii?  I mean, after vaginal sex

23   occurred --

24      A.   Yeah, I cleaned my room.

25      Q.   -- did you go to the room where the mops are kept

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 53 of 62   Pageid#: 446

1  and pick up a mop?

2     A.  I mean, it's not really a room.  It's right there

3  in front of the shower.

4     Q.  Did you go to where the area in front of the

5  shower where the mops are kept and pick up a mop that

6  day?

7     A.  Yes, and cleaned my room.

8     Q.  Right after having sex?

9     A.  I went and took a shower and grabbed a mop on the

10  way out.

11    Q.  So after sex you went and took a shower?

12    A.  Uh-huh.

13    Q.  Immediately?

14    A.  Yeah.

15    Q.  As soon as sex was over?

16    A.  Yeah, because my rec time started.

17    Q.  So when Farrar left the room after ejaculating

18  into the washcloth and taking the washcloth with him to

19  answer the phone, at the same time you left to take a

20  shower?

21    A.  My door was still open.

22    Q.  Who let you in the shower?

23    A.  Nobody let me in.  The shower doors were open.

24    Q.  The shower doors are locked, though, aren't they?

25    A.  No, they're not.  If nobody is in them they're

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 54 of 62   Pageid#: 447

1    actually held open with a rubber stopper.

2      Q.  So you went to take a shower and the door was

3    open?

4      A.  Uh-huh.

5      Q.  How long were you in the shower?

6      A.  I don't know.  Long enough to cry and wash my

7    body.

8      Q.  And after you left the shower you grabbed the mop

9    and dragged it back to cell one?

10     A.  Uh-huh.

11         MR. VALOIS:  I'm going to try to use the document

12   camera here, if I could have a few minute.

13         THE COURT:  Why don't we take a short recess?

14   Ladies and gentlemen, let's take a short recess.

15         (The jury retired to the jury room and a recess

16          was taken.)

17         THE COURT:  Bring the jury back.

18         (The jury returned to the courtroom.)

19

20   BY MR. VALOIS:  (Continuing)

21     Q.  Ms. Painter, can you hear me okay?

22     A.  Yes.

23     Q.  I'm going to ask you to look at some documents

24   and I just want you to tell me whether or not you dated

25   and signed these documents.  Do you know what an intake

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 55 of 62   Pageid#: 448

1    request form is?

2        A.  (Witness nods head.)

3        Q.  Can you explain to the jury what an intake

4    request form is?

5        A.  All the request forms are the same.

6        Q.  And what do you do with them?  Why do you use

7    them?

8        A.  You have to use them for going to the doctor, the

9    nurse.  Anything you have to do, you have to fill it out

10   first.

11       Q.  Have you filled out a lot of request forms?

12       A.  Do I fill out a lot?

13       Q.  Uh-huh.  When you were in jail have you filled

14   out a lot of request forms?

15       A.  Yeah.

16       Q.  I'm going to ask you to look at this one here.

17   Do you recognize this one?

18           MS. JOHNSON:  Your Honor, at this point I'm going

19   to object as to relevance.  I don't mind him

20   specifically approaching her and asking her did she sign

21   and date these forms but if he's planning on offering --

22   they contain information that has nothing to do with

23   this case.

24           MR. VALOIS:  I'd rather do it this way.

25           THE COURT:  That's fine if you want to approach

EVANS & COMPANY
434-239-2552

1 and have her look through them.

2      MR. VALOIS: And may I approach?

3      THE COURT: Yes.

4   Q. Ms. Painter, can you look at this request form

5 here? Did you date that one 4/9/15?

6   A. Uh-huh.

7   Q. And that's you, Katherine Painter?

8   A. Uh-huh.

9      THE COURT: Ma'am, if you would answer with a yes

10 or no response.

11   A. Yes, sir.

12   Q. And then here we've got an inmate request form

13 dated 4/10. Is that you that dated that?

14   A. Yes, sir.

15   Q. All right. And then we have a notice here which

16 has your signature and the date here is 4/10, also. Is

17 that your signature and that date there?

18   A. Yes, sir.

19   Q. And another one same date, 4/10?

20   A. Yes, sir.

21   Q. Now, we have a request form here where you dated

22 it April 12th, right, and that's you? Is that correct?

23   A. Yes, sir.

24   Q. All right. We have here your signature on a

25 document that's dated April 14th. Do you recognize this

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 57 of 62   Pageid#: 450

1    document and do you recognize that as being your

2    signature and dated April 14th?

3      A.  Yes, sir.

4      Q.  Okay.  We have another document here dated

5    April 16th.  Have you signed that and dated it

6    April 16th?

7      A.  Yes, sir.

8      Q.  We have another document here that's dated

9    April 20th where you actually have the date and the

10   time, April 20th, fifteen twenty-nine.  Is that your

11   signature there?

12     A.  Yes, sir.

13     Q.  You wrote that date and time?

14     A.  No.

15     Q.  You did not?

16     A.  No, but I signed it.

17     Q.  On the 20th here we have an inmate request form.

18   Did you put the date of 4/20/15 and put your name there?

19     A.  Yes, sir.

20     Q.  We have another one on the same date, same thing.

21   You dated it and put your name there?

22     A.  Yes, sir.

23     Q.  Thank you.  The next date is April 21st.  Did you

24   do an inmate request form and date it April 21st and put

25   your name there?

1    A.   Yes, sir.

2    Q.   Then April 27th we have another inmate request

3    form here, April 27th.  Did you put your name and date

4    that?

5    A.   Yes, sir.

6    Q.   And put your name there, too?

7    A.   Yes, sir.

8    Q.   April 28th another one, a grievance form with

9    your name and the date there?

10   A.   Yes, sir.

11   Q.   And also your signature and date again at the

12   bottom?

13   A.   Yes, sir.

14   Q.   May 1st a request form.  Did you date that and

15   put your name there on May 1st?

16   A.   Yes, sir.

17   Q.   May 5th, did you date that and put your name

18   there?

19   A.   Yes, sir.

20   Q.   Another one on May 5th?

21   A.   Yes, sir.

22   Q.   Another one on May 6th?

23   A.   Yes, sir.

24   Q.   May 13th?

25   A.   Yes, sir.

Case 6:17-cv-00034-NKM-RSB   Document 58-1   Filed 05/09/18   Page 59 of 62   Pageid#: 452

1    Q.  And May 15th?

2    A.  Yes, sir.

3    Q.  And a second one on May 13th?

4    A.  Yes, sir.

5    Q.  All these you dated and put your name on; is that

6    correct?

7    A.  Uh-huh.

8        MR. VALOIS:  Your Honor, since there's a whole

9    bunch of them, if I can identify and ask that they be

10   submitted collectively as Defense Exhibit A.

11       MS. JOHNSON:  Again, my objection --  I don't

12   have any objection to her testimony with regard to the

13   fact she signed and dated those documents.  However,

14   there is information contained within those documents

15   that the Commonwealth says is not relevant to the

16   proceedings here today.

17       THE COURT:  Well, an objection of relevance with

18   respect to some of these.

19       MR. VALOIS:  Well, I don't need to get the

20   exhibit in.  She's already conceded that she signed

21   them.

22       THE COURT:  That's fine.

23   Q.  Now, on each of the dates when you signed each of

24   these documents you were aware of the date when you

25   signed them?  You're not making up dates and putting

1    them on these forms, are you, ma'am?

2       A.   No, sir.

3       Q.   So you understand that these dates include some

4    of the dates that you reported an incident occurred on,

5    the 1st, the 6th, the 29th?

6       A.   I was back in intake.  I was only in population

7    for a day and two and then Clark put me in protective

8    custody and then on the 16th I was upstairs for like two

9    hours and me and Liz Davis got into it.

10      Q.   Again, that's the answer to some other question.

11   The question I'm asking you is you understand that you

12   signed these forms and dated them on three of the dates

13   when you say that these incidents occurred; is that

14   correct?

15      A.   Yeah.

16      Q.   So you knew the dates on those dates?

17      A.   I was upstairs.

18      Q.   You were aware of the dates on the dates when you

19   filled out those forms?

20      A.   Yeah.  Sometimes you can ask an officer and

21   they'll tell you the date and time.

22      Q.   Do you recall having a conversation with --  are

23   you familiar with a correctional officer named Zee?

24      A.   Yes.

25      Q.   Who is Zee?

1    A.  She works upstairs in the girls' unit.

2    Q.  Have you had any interaction with Ms. Zee?

3    A.  When I was on suicide watch she let me take a

4  shower.

5    Q.  Did she participate in a strip search of you one

6  time?

7    A.  Yes, sir.

8    Q.  Pardon me.

9    A.  Yes, sir.

10    Q.  Do you recall making a statement to Ms. Zee that

11  you would do whatever it took to get out of intake?

12    A.  No, sir.

13    Q.  Do you recall making a statement to Ms. Zee that

14  the next time Ms. Zee came back you would be out of

15  intake?

16    A.  No, sir.

17    MR. VALOIS:  Ms. Painter, I don't have any

18  further questions.  Thank you.

19

20                REDIRECT EXAMINATION

21  BY MS. JOHNSON:

22    Q.  Ms. Painter, I'm going to show you what's been

23  already marked and entered into evidence as

24  Commonwealth's Exhibit Number 54.  Do you agree that a

25  jail officer is leaning over?